**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

BLANE BENEDICT, D/B/A BLANE BENEDICT FARM, and BRYANT PARRISH FARMS PARTNERSHIP, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE MOSAIC CO.; MOSAIC FERTILIZER, LLC; NUTRIEN AG SOLUTIONS; NUTRIEN, LTD; CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES, INC.; CF INDUSTRIES NITROGEN, LLC; KOCH AGRONOMIC SERVICES, LLC; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; AND CANPOTEX LTD.,

Defendants.

Case No. ________

**Jury Trial Demanded**

**CLASS ACTION COMPLAINT**

Plaintiffs Blane Benedict, d/b/a Blane Benedict Farm ("Benedict") and Bryant Parrish Farms Partnership ("Parrish") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, make this Complaint against Defendants The Mosaic Co.; Mosaic Fertilizer, LLC; Nutrien Ag Solutions; Nutrien, LTD; CF Industries Holdings, Inc.; CF Industries, Inc.; CF Nitrogen, LLC; Koch Agronomic Services, LLC; Koch Ag & Energy Solutions, LLC; Koch Fertilizer, LLC; Yara International ASA; Yara North America, Inc.; and Canpotex Ltd. (collectively, "Defendants"). Plaintiffs, upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to Section 1 of the Sherman Act and related claims under various state laws, and demand a trial by jury on all matters so triable.

## I. NATURE OF THE ACTION

1. Among the most vitally important backbones of our nation are farmers. Their tireless dedication to feeding us, often working before dawn as good stewards of the land, and their resilience generates an abundant food supply, fuels our economy and, in no small way, ensures the preservation of our heritage and prosperity. As Daniel Webster so aptly stated, "[w]hen tillage begins, other arts follow. The farmers are the founders of human civilization." Indeed, their commitment and perseverance nourish the world. As President John F. Kennedy famously said, "[t]he farmer is the only man in our economy who buys everything at retail, sells everything at wholesale, and pays the freight both ways." As more fully alleged below, when it comes to the purchase of nitrogen, phosphate, and potassium (potash) fertilizers (individually and collectively, "NPK Fertilizers") upon which farmers depend to grow and sustain crops, the American farmer has been greatly overpaying "the freight" at prices that have been artificially inflated as a consequence of defendants' violation of federal antitrust laws.

2. This lawsuit seeks both monetary and injunctive relief arising from Defendants' unlawful and ongoing agreement to fix the prices for NPK Fertilizers sold and purchased throughout the United States and its territories, from January 1, 2021, until Defendants' unlawful conduct and anticompetitive activities cease (the "Class Period").

3. Defendants are direct competitors and among the largest producers and sellers of NPK Fertilizers in the United States.

4. Plaintiffs and Class Members are those who purchased NPK Fertilizers indirectly from Defendants for use in their agricultural crop growing operations.

5. To implement their price-fixing conspiracy, beginning at least as early as January 1, 2021, the exact date being unknown to Plaintiffs at this time, Defendants conspired to artificially inflate the price of NPK Fertilizers.

6. Defendants' unlawful agreement caused and continues to cause all purchasers of NPK Fertilizers in the United States and its territories, including Plaintiffs and the Classes, to pay supracompetitive prices for NPK Fertilizers sold by Defendants in the United States and its territories throughout the Class Period, in violation of Sections 1 of the Sherman Act (15 U.S.C. § 1) and various state antitrust laws and state unfair competition laws and unjust enrichment laws.

## II. JURISDICTION AND VENUE

7. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). In addition, Plaintiffs bring state law claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in artificially increasing the price of fertilizers.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

9. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

10. Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) because each Defendant has transacted business in this state and each Defendant has sufficient minimum contacts with the State of Kansas to satisfy Due Process.

11. This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the U.S. and including in this District. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.

## III. PARTIES

### A. Plaintiffs

12. Plaintiff Blane Benedict is a fifth generation farmer doing business as Blane Benedict Farm, on a farm located at 6775 50th Avenue, South Sabin, Minnesota. Benedict has, for at least five seasons, utilized NPK fertilizer on 1,500 acres of crops such as sugar beets, corn, and spring wheat.

13. During the Class Period, Plaintiff Benedict purchased NPK Fertilizers for its end use, including fertilizers manufactured by defendant Mosaic, as defined herein, via a dealer located in Minnesota. Benedict suffered damages because it paid, and continues to pay, inflated prices for NPK Fertilizers as a direct result of the antitrust violations committed by Defendants, as outlined in this complaint. Benedict intends to purchase NPK Fertilizers in the future.

14. Plaintiff Bryant Parrish Farms Partnership operates an independent family farm at 28156 Highway 17, Lexington, Mississippi. During the Class Period, Parrish purchased NPK Fertilizers, once or more, other than directly from Defendants or entities owned or controlled by

Defendants. The fertilizer purchased by Parrish was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Parrish suffered monetary loss as a result of the antitrust violations alleged herein.

### B. Defendants

**Mosaic Defendants**

15. The Mosaic Company is a publicly traded company, listed on the New York Stock Exchange (NYSE: MOS), with headquarters located at 13830 Circa Crossing Drive, Lithia, Florida 33547. The Mosaic Company is the world's leading integrated producer of concentrated phosphate and potash nutrients for use in NPK Fertilizers.

16. Defendant Mosaic Fertilizer, LLC ("Mosaic Fertilizer")[1] is a Delaware limited liability company headquartered in Minnetonka, Minnesota and is a subsidiary of Mosaic Company. During the Class Period, Mosaic Fertilizer manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers throughout the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

17. Mosaic Company and Mosaic Fertilizer are collectively referred to throughout the Complaint as "Mosaic."

**Nutrien Defendants**

18. Nutrien Ag Solutions ("NAS") is the global retail division, and wholly owned subsidiary of, Nutrien Ltd., with headquarters located at 3005 Rocky Mountain Avenue, Loveland, Colorado 80538. Nutrien Ag Solutions is one of the largest manufacturers and distributors of nitrogen, phosphate and potash NPK Fertilizers in the United States.

---

[1] *Our Mission*, Mosaic, https://mosaicco.com/About. (last visited May 27, 2026).

19. Nutrien Ltd. is a Canadian company headquartered in Saskatchewan, Canada. Nutrien Ltd. describes itself as "a leading global provider of crop inputs and services" operating "a world-class network of production, distribution and ag retail facilities…."[2] Nutrien Ltd. boasts that it is :"the world's largest producer" of potash and the "world's third largest nitrogen producer" giving it an "advantaged position across the ag value chain" that allows it to "anticipate trends, respond faster and more effectively produce and distribute the products and services that farmers need."[3] During the Class Period, Nutrien Ltd. manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers in the United States and its territories and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

20. Nutrien Ltd. and NAS are collectively referred to throughout the Complaint as "Nutrien."

**CF Industries Defendants**

21. CF Industries Holdings, Inc., headquartered in Northbrook, Illinois, is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF). CF Industries Holdings, Inc. produces four nitrogen-based NPK Fertilizers for sale throughout the United States and the United Kingdom.

22. CF Industries Inc., a Delaware corporation headquartered in Northbrook, Illinois, is a wholly-owned subsidiary and the primary operating subsidiary of CF Industries Holdings. CF Industries Inc. describes itself as a "leading global manufacturer of hydrogen and nitrogen products for . . . fertilizer…."[4] During the Class Period, CF Industries Inc. manufactured, sold, and/or

---

2 *Our Business*, Nutrien, https://www.nutrien.com/about/our-business (last visited May 27, 2026).
3 *Id.*
4 CF Industries, Inc., https://www.cfindustries.com/ (last visited May 26, 2026).

imported NPK Fertilizers in interstate commerce to purchasers throughout the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

23. CF Industries Nitrogen, LLC ("CF Nitrogen"), headquartered in Northbrook, Illinois, is a Delaware corporation. During the Class Period, CF Nitrogen manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers throughout the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

24. CF Industries Holdings, CF Industries Inc., and CF Nitrogen are collectively referred to throughout the Complaint as "CF Industries."

**Koch Defendants**

25. Koch Agronomic Services ("KAS"), LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is itself a wholly owned subsidiary of Koch Industries. KAS' headquarters is located at 4111 E 37th Street N, Wichita, Kansas, 67220. Koch is a leading manufacturer of nitrogen-based NPK Fertilizers throughout the United States.

26. Defendant Koch Ag & Energy Solutions, LLC ("KAES"), headquartered in Wichita, Kansas, is a Delaware limited liability company. KAES describes itself as a "global provider of value-added solutions for the agriculture, energy and chemical markets" that produces fertilizer and nutrient enhancement products.[5] During the Class Period, KAES manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers throughout the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

27. Koch Fertilizer, LLC ("Koch Fertilizer"), headquartered in Wichita, Kansas, is a Delaware limited liability company and a wholly owned subsidiary of KAES. Koch Fertilizer and its affiliates are collectively one of the world's largest producers and marketers of fertilizers such

---

[5] *Koch Ag & Energy Solutions*, Koch AG & Energy Solutions, https://kochagenergy.com/ (last visited May 26, 2026).

as ammonia, urea, urea ammonium nitrate, phosphate, potash, and sulfur-based products.[6] Koch Fertilizer manufactures, markets, and distributes more than 12 million metric tons of fertilizer products annually.[7] During the Class Period, Koch Fertilizer manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers throughout the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

28. KAES, Koch Fertilizer, and KAS are collectively referred to throughout the Complaint as "Koch."

**Yara Defendants**

29. Yara International ASA is a publicly traded company, listed on the Oslo Stock Exchange (YAR.OL), with headquarters located at Drammensveien 131, 0277 Oslo, Norway. Yara International ASA is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizers.

30. Yara North America, Inc. ("Yara North America"), headquartered in Tampa, Florida, is a Delaware corporation headquartered and a wholly owned subsidiary of Yara International ASA. During the Class Period, Yara North America manufactured, sold, and/or imported NPK Fertilizers in interstate commerce to purchasers throughout the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

31. Yara International and Yara North America are collectively referred to throughout the Complaint as "Yara."

**Canpotex**

---

[6] *Companies: Koch Fertilizer*, Koch AG & Energy Solutions, https://kochagenergy.com/companies (last visited May 27, 2026).

[7] *Quality Products. Proven Results*, Koch Fertilizer, https://kochfertilizer.com/products (last visited May 27, 2026).

32. Canpotex Limited is a private jointly owned export company, equally owned by Nutrien, Ltd. (of which Defendant Nutrien Ag Solutions is a subsidiary) and Mosaic Canada Crop Nutrition, LP (a wholly owned subsidiary of Defendant The Mosaic Company). Canpotex Limited's headquarters are at 409 Third Avenue South, Suite 700, Saskatoon, Saskatchewan, Canada S7K 5R5. Canpotex is the world's leading producer of potash minerals used in NPK Fertilizers, and controls over 90% of the potash market.

**Co-Conspirators and Other Non-Parties**

33. Various other persons, firms, and corporations not named as Defendants may have participated as co-conspirators with Defendants and performed acts in furtherance of the illegal conduct described. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

34. The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

35. Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

36. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

37. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

38. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Furthermore, to the extent that subsidiaries within corporate families distributed the NPK Fertilizers discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements. Thus, all Defendant entities within the corporate families were active, knowing, participants in the conspiracy to maintain supracompetitive prices

## IV. FACTUAL ALLEGATIONS

### A. NPK Fertilizers Generally

39. Modern agriculture depends heavily on three essential nutrients that plants must have in large quantities: nitrogen, phosphorus, and potassium. These nutrients are supplied to crops through what farmers commonly call nitrogen, phosphate, and potash fertilizers—individually and in combination referred to as NPK Fertilizers (named after the chemical symbols for the nutrients they contain). Together they form the basis of most fertilizer programs around the world. Each plays a different role in plant growth, and each requires different raw inputs and is produced through distinct chemical and industrial processes.

40. NPK Fertilizers are applied individually or in blended formulations depending on crop and soil requirements. Farmers sometimes use single-nutrient products when a specific

nutrient is needed, but the nutrients can also be combined into blended fertilizers containing nitrogen, phosphorus, and potassium in set proportions. These blends typically are labeled with three numbers indicating the percentage of each nutrient in the product.

**Nitrogen Fertilizers**

41. Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key component of chlorophyll, the molecule that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

42. Most nitrogen fertilizers originate from industrial ammonia production using the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used to manufacture a variety of nitrogen fertilizer products.

43. Common nitrogen fertilizers include Urea, Ammonium nitrate, Ammonium sulfate, and Urea ammonium nitrate solution. These fertilizers vary in nitrogen concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

**Phosphate Fertilizers**

44. Phosphate fertilizers supply phosphorus, an essential nutrient required for several core plant functions. Phosphorus plays an important role in energy transfer within plant cells, including through molecules such as ATP, and contributes to early plant development, root

formation, and the production of flowers and seeds. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

45. Phosphate fertilizers are produced from phosphate rock, a naturally occurring mineral resource mined from geological deposits. After mining, the rock is processed chemically, typically by treatment with acids, to convert the phosphorus into forms that plants can readily absorb. This processing yields concentrated phosphate fertilizers used in commercial agriculture.

46. Common phosphate fertilizer products include Diammonium phosphate, Monoammonium phosphate, and Triple superphosphate. These fertilizers are generally manufactured as dry granules that can be transported in bulk and applied directly to fields or blended with other nutrients in compound fertilizers.

**Potash Fertilizers**

47. Potash fertilizers supply potassium, another primary plant nutrient required for healthy crop growth. Potassium helps regulate water movement within plant tissues, activates enzymes involved in metabolism, and supports plant tolerance to environmental stresses such as drought or disease. Adequate potassium availability can contribute to improved crop quality and resilience.

48. Potash fertilizers are produced from naturally occurring potash ores formed from ancient, evaporated seas. These mineral deposits are mined or extracted from brines and then processed to separate potassium-bearing compounds suitable for agricultural use. The resulting products contain potassium in forms that plants can absorb as potassium ions.

49. The most widely used potash fertilizer is Potassium chloride, while Potassium sulfate is also used, particularly for crops that are sensitive to chloride. Potash fertilizers are

typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

50. Defendant Canpotex is a Canadian potash export and marketing company owned by Defendants Nutrien and Mosaic. Canpotex coordinates offshore marketing, sales, and transportation of potash produced by Nutrien and Mosaic.

51. Through Canpotex, its owners collectively market and distribute potash produced from their Canadian mines to customers outside of North America.

52. Canpotex operates an integrated export system that includes a fleet of specialized railcars, port terminal facilities, and dedicated ocean vessels used to transport potash overseas. This infrastructure allows Canpotex's members to export potash from Saskatchewan mines to overseas customers through a centralized transportation network.

53. Canpotex provides its owners, Nutrien and Mosaic, with a mechanism for coordinating key aspects of potash sales, including export volumes and shipment schedules. Upon information and belief, Canpotex collects and manages competitively sensitive information concerning potash production, inventories, customer demand, pricing conditions, and shipment logistics.

54. While Canpotex is not used to export potash into the United States, the use of Canpotex as a joint exporting and marketing organization creates opportunities for Nutrien and Mosaic, to exchange competitively sensitive information and align their pricing and supply strategies in the United States.

**B. The Market for NPK Fertilizers**

55. American farms cultivate over 220 million acres of cropland, driving an unrelenting demand for NPK Fertilizers. In 2024, the U.S. NPK Fertilizer market was estimated to be valued at almost $30 billion.

56. NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK Fertilizers provide precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

57. The Fertilizer industry in the United States has long been characterized by significant consolidation. The NPK Fertilizer industry experienced a drastic consolidation following various market conditions dating back to the 1980s.[8] As a result, today each of the major nutrient industries is dominated by a single corporation: Mosaic reigns over the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the North American potash market as the leading member along with Mosaic.[9] The number of firms in the market has reduced from 46 to 13 since the 1980s, with Defendants now controlling a substantial portion of the market.[10]

58. Just three companies (Nutrien, Mosaic, and CF Industries) control most of the domestic NPK Fertilizer markets. Defendants CF Industries, Nutrien, Koch, and Yara control approximately 80 percent of the nitrogen fertilizer market in the United States. For phosphorus

---

8 *See* Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf ("The fertilizer industry has a historical precedence of extreme consolidation…").

9 *Id.*

10 Nathan Beacom, Record Prices Give rise to Consolidation Concerns in the Fertilizer Industry (Sept. 23, 2022), available at https://ambrook.com/offrange/supply-chain/record-prices- consolidation-concerns-fertilizer-industry-ukraine-nitrogen (last visited May 27, 2026).

fertilizers, Defendants Mosaic and Nutrien represent approximately 90 percent of the market and over 90 percent of the potash fertilizer market.

**C. Government Investigation into Price-Fixing in the Fertilizer Industry**

59. On October 28, 2025, President of the Iowa Corn Growers Association ("ICGA"), Mark Mueller, addressed a U.S. Senate Committee Hearing on Competition Issues in the Seed & Fertilizer Industries, telling them that, "the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent."[11] Mueller attributed the high fertilizer prices to two decades of unchecked consolidation in the U.S. Fertilizer industry, which left only a few major companies controlling each market segment.[12]

60. According to Mueller, the effects of this market concentration had led to fertilizer costs that far outpaced the price farmers received for their corn.[13] For example, the amount of corn sales required to purchase one unit of monoammonium phosphate (a fertilizer that combines phosphorous and nitrogen) had increased from an average of 136 bushels over the last five years to 230 bushels today, increasing the economic pressure on farmers, as fertilizer prices escalate while crop revenues remain comparatively stagnant.[14]

61. In December 2025, President Donald Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a

---

11 Testimony of Mark Mueller President of the Iowa Corn Growers Association, U.S. Senate Committee Judiciary Hearing on Competition Issues in the Seed & Fertilizer Industries (Oct. 28, 2025), available at https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf (last visited May 27, 2026).

12 *Id.*

13 *Id.*

14 *Id.*

Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[15]

62. On January 21, 2026, United States Department of Agriculture Deputy Secretary, Stephen Vaden, held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticompetitive conduct, telling the audience that:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay.[16]

63. In February 2026, both the ICGA and the Texas Corn Producers Association sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice ("DOJ") is doing to pursue possible antitrust actions against the fertilizer industry.[17] As reported by Progressive Farmer, the letters reflect farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.[18]

64. On March 4, 2026, Bloomberg reported that the DOJ Antitrust Division had opened a formal antitrust investigation into the pricing practices of major Fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices for U.S. farmers.[19] Bloomberg further reported that the investigation is looking at CF Industries, Koch

---

[15] The White House, Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain (Dec. 6, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses- security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/ (last visited May 27, 2026).

[16] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), recording available at https://nationalaglawcenter.org/webinars/vaden/ (last visited May 27, 2026) .

[17] Progressive Farmer, Report: DOJ Looking at Fertilizer Cos. (Mar. 5, 2026), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press?utm_source=chatgpt.com (last visited May 27, 2026) .

[18] *Id.*

[19] Bloomberg, DOJ Probes US Fertilizer Market for Possible Price Fixing (Mar. 4, 2026), available at https:/https://www.bloomberg.com/news/articles/2026-03-04/doj-probes-us-fertilizer-market-for-possible-price-fixing? (last visited May 27, 2026).

Inc., Mosaic, Nutrien, and Yara International. Those companies are the dominant suppliers of fertilizer products in the United States.[20] Sources told reporters the government inquiry is examining whether coordinated pricing or supply decisions crossed the line into civil or criminal antitrust violations.[21]

65. A survey conducted by the American Farm Bureau between April 3 and April 11, 2026, highlighted the unaffordability crisis afflicting American farmers.[22] According to the survey, approximately 70% of farmers were unable to afford all of the fertilizer they needed, with the unaffordability crisis impacting every region of the United States:[23]




---

[20] *Id.*
[21] Farm Progress, DOJ probes U.S. fertilizer market for possible price fixing (Mar. 4, 2026), available at https://www.farmprogress.com/farm-business/doj-probes-u-s-fertilizer-market-for- possible-price-fixing (last visited May 27, 2026).
[22] Farm Bureau Survey Reveals Real Impact of Fertilizer Availability and Price | Market Intel | American Farm Bureau Federation, https://www.fb.org/market-intel/farm-bureau-survey-reveals-real-impact-of-fertilizer-availability-and-price (last visited May 28, 2026).
[23] *Id.*

66. The result of this unaffordability crisis has been a staggering increase in farm bankruptcies and a related loss of farms, with one report noting that the United States "lost more than 94,000 farms between 2021 and 2025, accounting for nearly 15 million acres of lost farmland."[24]

67. On May 12, 2026, Eddie Melton, President of the Kentucky Farm Bureau, testified before the United States Senate Committee on Agriculture, Nutrition, and Forestry, highlighting the "persistent and pressing issue" of "the sustained rise in fertilizer and input costs, and the broader financial strain it is placing on the agriculture sector."[25] In his prepared statement before the committee, Melton highlighted, among other things, the sharp spike in nitrogen fertilizer prices since January 2020:[26]

24 Farmers demand fertilizer 'monopoly' probe, https://finance.yahoo.com/economy/policy/articles/farmers-demand-fertilizer-monopoly-probe-125650886.html (last visited May 28, 2026).

25 Senate Testimony: "Perspectives on the Fertilizer Industry: Ensuring a Stable and Affordable Supply for American Producers" | News Release | American Farm Bureau Federation, https://www.fb.org/news-release/senate-testimony-perspectives-on-the-fertilizer-industry-ensuring-a-stable-and-affordable-supply-for-american-producers (last visited May 28, 2026).

26 *Id.*




68. On May 28, 2026, Andrew Ferguson, chair of the Federal Trade Commission ("FTC"), announced that the FTC had undertaken a formal investigation of fertilizer pricing and market concentration.[27] In announcing what he described as a "major industry-wide investigation," Ferguson stated that "these continued price increases are not something our nation, much less our farmers, can continue to ignore."[28]

**D. Prices for NPK Fertilizers Rose Precipitously During the Class Period and Remained Elevated Despite Lower Input Prices and Lower Demand**

69. Prior to the start of the conspiracy, NPK Fertilizer price increases were typically transitory, and market forces corrected pricing (consistent with a competitive market).

70. NPK Fertilizer prices became significantly elevated during the Class Period as a result of Defendants' conduct. This was contrary to pricing patterns prior to the Class Period.

---

[27] FTC Launches Formal Investigation Into Fertilizer Industry as Farmers Say They're 'Fed Up' - AgWeb, https://www.agweb.com/news/policy/politics/ftc-launches-formal-investigation-fertilizer-industry-farmers-say-theyre-fed (last visited on May 29, 2026).
[28] *Id.*

71. Upon information and belief, Defendants' conspiracies were implemented through coordinated output restraint and capacity discipline. Defendants in each market collectively restricted the supply of NPK Fertilizers sold into the United States by, among other things: (1) restraining production and idling available capacity; (2) delaying or limiting production expansions despite record-high prices; (3) managing inventory in a manner that maintained artificial scarcity; and (4) ensuring that no Defendant meaningfully expanded output in response to price increases.

72. In a competitive market, record-high prices would ordinarily prompt swift and sustained supply response. That did not occur here. Instead, Defendants maintained "capacity discipline" and ensured that supply in each market remained tight even as prices rose to historic highs. This "managed scarcity" was engineered by the Defendants to reduce supply and inflate prices.

73. Rather than act independently in their individual business interests, Defendants agreed to collectively reduce and manage their respective production volumes that are made available to the downstream market, including to Plaintiffs and Class members.

74. The market structure made such a scheme feasible. With only a handful of dominant producers controlling nearly all North American NPK Fertilizer production, Defendants did not need to coordinate with dozens of firms. They only needed to coordinate with each other in their respective markets.

75. Defendants' ability to restrict supply in each market was further strengthened by high barriers to entry and the long build up times required to establish new production facilities or mines. These barriers prevent competitive supply responses that would otherwise discipline Defendants' pricing.

76. As a result, Defendants were able to sustain record-high NPK Fertilizer prices for an extended period, forcing farmers and other direct purchasers to pay supracompetitive prices.

77. Throughout 2021 and 2022, prices for NPK fertilizers, including nitrogen, phosphorus, and potash-based fertilizers, rose to historic highs, as indicated by the charts below.

78. The Producer Price Index for Fertilizer Manufacturing during the period of 2012 to the present exemplifies the rapid and historic price increase seen in 2021 and 2022:




79. Similarly, the Producer Price Index for Nitrogen Fertilizers shows a nearly identical trajectory over the same period of 2012 to the present:




80. The Producer Price Index for Phosphatic Fertilizer Manufacturing similarly shows a sharp and historic price increase in the 2021-2022 period:




81. Finally, the Producer Price Index for Potash, which does not have available data after calendar year 2022, also shows a sharp rise in prices in 2021-2022:




82. These increases cannot be explained by input costs.

## E. The Structure and Characteristics of the Market for NPK Fertilizers Support the Existence of a Conspiracy

83. Economic literature makes clear that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

84. ***Concentration of supply side***: The Defendants are among the largest producers of NPK Fertilizers sold in the United States and together control over 80% of the North American nitrogen fertilizer market and over 90% of the North American phosphate and potash markets. Because the manufacture of NPK Fertilizers is highly concentrated, with the Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.[29]

---

[29] *See* https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market- allocation-post-disaster-rebuilding ("Collusion is more likely to occur if there are few sellers. The fewer the number of sellers,

85. ***Standardization***: NPK Fertilizers are standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. This standardization also makes it easier for competing firms to coordinate on a common price structure.

86. ***Opportunities to collude at trade association meetings***: Collusion also may be facilitated by trade associations. Here, Defendants have had multiple opportunities to collude through trade associations to which they belonged and served as board members. For example, all six Defendant groups are active members of the International Fertilizer Association ("IFA"),[30] a global fertilizer association, headquartered in Paris, France.[31] Bruce Bohn (CF Industries), Bruce Bodine (The Mosaic Company), Kenneth Seitz (Nutrien), and Svein Tore Holsether (Yara International ASA), are also members of IFA's Board.[32] IFA sponsors a number of recurring in-person trade events including the IFA Annual Conference and the Cultivating Tomorrow Conference.[33]

87. Similarly, CF Industries, Inc, Koch Fertilizer, LLC., The Mosaic Company, Nutrien, and Yara North America, Inc., are all members and Board members, of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia.[34] In addition to offering exclusive members-only "market volatility information and resources,"[35] TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.[36]

---

the easier it is for them to get together and agree on prices, bids, customers, or territories.") (last visited May 27, 2026).

30 https://www.fertilizer.org/about-ifa/our-members/ (last visited May 27, 2026).

31 https://www.fertilizer.org/about-ifa/contact-us/ (last visited May 27, 2026).

32 https://www.fertilizer.org/about-ifa/structure-governance/our-board/ (last visited May 27, 2026).

33 https://www.fertilizer.org/news-events/events/ (last visited May 27, 2026).

34 https://www.tfi.org/about-us/leadership/ (last visited May 27, 2026).

35 Market Intelligence Insights - The Fertilizer Institute (last visited May 27, 2026).

36 https://www.tfi.org/events/event-calendar/ (last visited May 27, 2026).

88. All six Defendants are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario.[37] CF Industries, Inc., Koch Fertilizer Canada, ULC, The Mosaic Company, Nutrien, and Yara North America, Inc. are members of the Board of FC.[38] FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.[39]

89. Nutrien Ltd., The Mosaic Company, and Koch Sulfur Products Company L.L.C., are all members[40] and Board members[41] of The Sulfur Institute ("TSI"), a global association for sulfur and sulfuric acid professionals, based in Washington, D.C.[42] TSI sponsors a number of in-person trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting.[43]

90. Both David Bilby (CF Industries) and Shawn McGreevy (Koch Fertilizer LLC), are Board members of the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group.[44] Gary Vogen (Yara North America, Inc.), previously served as a Board member of FIRT.[45] FIRT hosts an annual meeting, in partnership with TFI.[46]

91. Both Koch Agronomic Services, LLC and The Mosaic Company are members of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia.[47] Additionally, Nathan Packer (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company), are members of the Board of ARA.[48] ARA hosts a number of recurring in-person

---

37 https://fertilizercanada.ca/about/ (last visited May 27, 2026).
38 https://fertilizercanada.ca/about/ (last visited May 27, 2026).
39 https://fertilizercanada.ca/about/ (last visited May 27, 2026).
40 https://www.sulphurinstitute.org/about-tsi/member-companies/ (last visited May 27, 2026).
41 https://www.sulphurinstitute.org/about-tsi/board-of-directors/ (last visited May 27, 2026).
42 https://www.sulphurinstitute.org/about-tsi/mission-and-programs/ (last visited May 27, 2026).
43 https://www.sulphurinstitute.org/events/tsi-meetings-and-events/ (last visited May 27, 2026).
44 http://www.firt.org/about/current-board (last visited May 27, 2026).
45 http://www.firt.org/about/past-member (last visited May 27, 2026).
46 http://www.firt.org/about (last visited May 27, 2026).
47 https://www.aradc.org/members (last visited May 27, 2026).
48 https://www.aradc.org/board (last visited May 27, 2026).

events, including the Annual ARA Conference and Expo,[49] in addition to semi-annual in-person meetings of ARA committees.[50]

92. ***High barriers to entry***: There are also high barriers to becoming a manufacturer of NPK Fertilizers. A large capital investment is required to enter the industry, as companies wishing to enter must purchase machines and operating space to manufacture NPK Fertilizers. The importance of research and development in the industry also may deter new entrants.

93. Potential entrants to the industry also must make a significant financial investment to acquire, maintain and update production facilities and equipment. Larger players have an advantage because they are able to build or acquire multiple manufacturing facilities, discouraging others from entering.

94. Thus, the start-up capital necessary to compete with today's NPK Fertilizer manufacturers would be substantial. NPK Fertilizer manufacturers have significant economies of scale, utilizing large and expensive production facilities. Barriers to entry in NPK Fertilizer manufacturing both prevent new competitors from entering the market and make the market susceptible to collusion.

95. ***Inelastic demand***: Demand for NPK Fertilizers is inelastic. Industries with inelastic demand, such as the NPK Fertilizers manufacturing industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

96. A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizers cannot be interchanged freely with other goods—although there are other fertilizers, NPK Fertilizers are unique because they provide precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers.

---

[49] https://www.aradc.org/2026-conference-expo (last visited May 27, 2026).
[50] https://www.aradc.org/get-involved (last visited May 27, 2026).

97. Customers similarly do not view NPK Fertilizers as interchangeable with other fertilizers.

98. ***Unconcentrated demand side***: The unconcentrated nature of the demand side of the NPK Fertilizers market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

99. ***History of antitrust violations***: Finally, The NPK Fertilizers industry has a history of antitrust scrutiny. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, Potash Corporation of Saskatchewan ("PotashCorp"), and Agrium, Inc., – coordinated production and sales to keep potash prices artificially high. Plaintiffs alleged producers shared market information, allocated volumes, and restricted output as part of a "tight-knit global cartel." Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).[51]

100. ***Exchange of Competitively Sensitive Information***: The reciprocal sharing of firm-specific, competitively sensitive, information that would normally be kept private is a "super plus factor" that leads to a strong inference of active collusion. In a market free of collusion, competitive information would be closely safeguarded, especially from competitors. The sharing of competitively sensitive information shows that Defendants' exorbitant price increases are not

[51] PotashCorp and Agrium, Inc., merged in 2019 to form Nutrien LTD.

explained by interdependence, as marketplace interdependence is predicated on participants reacting to observed conduct.

101. As described above, Defendants Mosaic and Nutrien are members of Canpotex, a Canadian export marketing agency through which Defendants collectively sell their Canadian potash into overseas markets. Canpotex allows Defendants to share a range of competitively sensitive data, including production data, pricing information, and sales volumes. The data Canpotex collects is data which would normally be kept confidential given its competitively sensitive nature. Moreover, Defendants' employees display significant overlaps with those of Canpotex. For example, Nutrien's CEO was formerly the President and CEO of Canpotex.

102. As described above, Defendants reduced their output and capacity to produce NPK Fertilizers for sale to Plaintiffs and class members. In a competitive market, the reduction in output by one producer typically presents an opportunity for competitors to capture market share in the face of constant or increasing demand.

## V. ANTITRUST INJURY

103. Defendants' antitrust conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to the pricing of NPK Fertilizers;

(b) The prices of NPK Fertilizers have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c) Purchasers of NPK Fertilizers have been deprived of the benefits of free and open competition; and

(d) Purchasers of NPK Fertilizers paid artificially inflated prices.

104. The purpose of the conspiratorial and unlawful conduct of Defendants was to fix, raise, stabilize, and/or maintain the price of NPK Fertilizers.

105. The precise amount of the overcharge impacting the prices of NPK Fertilizers paid by Plaintiffs and the Classes can be measured and quantified using well-accepted models.

106. Because of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for NPK Fertilizers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws are intended to punish and prevent.

107. While direct purchasers were the first to pay supracompetitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiffs and class members when they purchased the NPK Fertilizers for their use.

108. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution to indirect purchasers. Thus, the economic harm to Plaintiffs and the class members can be quantified.

109. Defendants' violations of the Sherman Act and other antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws caused Plaintiffs and the class members to suffer injury to their businesses or property.

110. This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

## VI. INTERSTATE TRADE AND COMMERCE

111. Billions of dollars of transactions in NPK Fertilizers are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

112. Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

113. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States.

114. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of NPK Fertilizers sold in the United States, the prices of NPK Fertilizers would have been determined by a competitive, efficient market.

## VII. DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

115. A continuing violation restarts the statute of limitations period each time Defendants commit an overt act.

116. Plaintiffs and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

117. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the Classes.

118. Plaintiffs and members of the Classes had no knowledge of the unlawful conduct alleged in this Complaint until early 2026, when the USDA made allegations that Defendants were engaging in anticompetitive conduct and the DOJ's antitrust investigation was publicly revealed.

119. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Classes has been tolled during the period of such fraudulent concealment.

120. Defendants' overt acts began a new statute of limitations because they advanced the objectives of Defendants' conspiracy. Indeed, every statement involved different facts and suggestions but sprang from the same seed—Defendants' conspiracy.

121. Defendants' overt acts, beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of NPK Fertilizers by a Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violation that injured Plaintiffs and the class members and started the statutory period running again.

122. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs and the class members.

## VIII. CLASS ACTION ALLEGATIONS

123. Plaintiffs bring this action individually and as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the following classes (the "Nationwide Class"):

> **Nationwide Indirect Purchaser Class:** All entities and persons in the United States and its territories who, during the Class Period, purchased nitrogen fertilizers, phosphorous fertilizers, or potassium fertilizer, once or more, other than directly from Defendants, entities owned or controlled by Defendants, from January 1, 2021 to present for their own use in crop production. Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

124. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Indirect Purchaser States")[52] on behalf of the following class (the "Damages Class"):

> **Damages Class:** All persons and entities in the Indirect Purchaser States that purchased nitrogen fertilizers, phosphorous fertilizers, or potassium fertilizers, once or more, other than directly from Defendants, entities owned or controlled by Defendants, from January 1, 2021 to present for their own use in crop production. Excluded from the Damages Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

125. ***Numerosity***. While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

---

[52] The Indirect Purchaser States include the following states: Alabama, Arkansas, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

126. ***Commonality***. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Classes, thereby making relief with respect to the Classes as a whole appropriate. Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of NPK Fertilizers in the United States and its territories;

(b) Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(c) The identity of the participants in the alleged conspiracy;

(d) The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

(e) Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(f) Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged herein;

(g) Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged herein;

(h) Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(i) The effect of the alleged conspiracy on the price of NPK Fertilizers during the Class Period;

(j) Whether the Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the members of the Classes;

(k) The appropriate injunctive and related equitable relief for Plaintiffs and the Classes; and

(l) The appropriate class-wide measure of damages.

127. ***Typicality***. Plaintiffs' claims are typical of the claims of the members of the Classes they seek to represent, and Plaintiffs and undersigned counsel will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of their respective Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for fertilizer from Defendants.

128. ***Adequacy***. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of their respective Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of their respective Classes. Plaintiffs are represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

129. ***Predominance***. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

130. ***Superiority***. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX. CLAIMS

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade) (On Behalf of the Nationwide Indirect Purchaser Class)

131. Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

132. Beginning as early as January 1, 2021, the exact date being unknown, until the date on which any Class is certified, Defendants entered into and engaged in a contract, combination, or conspiracy with regard to fertilizer in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

133. The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizers in the United States and its territories.

134. In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including the following:

(a) Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of NPK Fertilizers sold in the United States and its territories;

(b) Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of NPK Fertilizers, including surcharges on NPK Fertilizers sold in the United States and its territories; and

(c) Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

135. Defendants engaged in the actions described above in order to effectuate their unlawful agreements to fix, raise, stabilize, or maintain prices of fertilizer.

136. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for NPK Fertilizers has been restrained, suppressed, and/or eliminated;

(b) Prices for NPK Fertilizers provided by Defendants have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c) Plaintiffs and members of the Class who purchased NPK Fertilizers manufactured and sold by Defendants have been deprived of the benefits of free and open competition.

137. Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for NPK Fertilizers purchased indirectly and that they would have paid and will pay in the absence of the conspiracy.

138. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws. It is also unlawful under a rule of reason analysis.

139. Plaintiffs and members of the Class are entitled to an injunction against Defendants to prevent and restrain the violations alleged herein.

**Count II: Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class)**

140. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

141. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of NPK Fertilizers in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

142. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supracompetitive prices for NPK Fertilizers, including in the United States and its territories.

143. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of NPK Fertilizers purchased by Plaintiffs and members of the Damages Class; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

144. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of NPK Fertilizers. As a direct and proximate result, Plaintiffs and members of the Damages Class were deprived of free and open competition and paid more for NPK Fertilizers than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

145. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and the members of the Damages Class.

146. Accordingly, Plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

147. **Alabama:** Defendants have entered into unlawful agreements in restraint of trade in violation of Ala. Code § 6-5-60, et seq. Defendants' conspiracies had the following effects: (1) price competition for NPK Fertilizer was restrained, suppressed, and eliminated throughout

Alabama; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for NPK Fertilizer. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ala. Code § 6-5-60.

148. **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for NPK Fertilizers was restrained, suppressed, and eliminated throughout Arizona; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

149. **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of NPK Fertilizers at supracompetitive levels. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of NPK Fertilizers. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they

combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and fixing, raising, and stabilizing the price of NPK Fertilizers. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for NPK Fertilizers has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for NPK Fertilizers provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased NPK Fertilizers indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

150. **Colorado:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. §§ 6-4-104, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for NPK Fertilizer was restrained, suppressed, and eliminated throughout Colorado; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for NPK Fertilizer. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Colo. Rev. Stat. §§ 6-4- 104, et seq.

151. **Connecticut:** Defendants have entered into unlawful agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for NPK Fertilizer was restrained, suppressed, and

eliminated throughout Connecticut; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for NPK Fertilizer. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, *et seq*.

152. **District of Columbia**: Defendants have entered into unlawful agreements in restraint of trade in violation of D.C. Code §§ 28-4501, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for NPK Fertilizer was restrained, suppressed, and eliminated throughout the District of Columbia; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for NPK Fertilizer. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under D.C. Code §§ 28-4501, *et seq*.

153. **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Illinois; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By

reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq*. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

154. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Iowa; (2) NPK Fertilizers price were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

155. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Kansas; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kan. Stat. § 50-101, *et seq*.

156. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Maine; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

157. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Michigan; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mich. Comp. Laws § 445.771, *et seq*.

158. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minn. Stat. § 325D.49, *et seq*.

159. **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants'

illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Miss. Code § 75-21-1, *et seq*.

160. **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Neb. Rev. Stat. § 59-801, *et seq.*

161. **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Nevada; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, *et seq*.

162. **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

163. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

164. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout New York; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

165. **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) NPK Fertilizer prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

166. **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-08.1-01, *et seq*.

167. **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout Oregon; (2) NPK Fertilizer prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

168. **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was

restrained, suppressed, and eliminated throughout Rhode Island; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq*.

169. **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq*.

170. **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tenn. Code Ann. § 47-25-101, *et seq*.

171. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combinations or conspiracies

had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Utah; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

172. **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Vermont; (2) NPK Fertilizers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 V.S.A. § 2465, *et seq.*

173. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

174. **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. § 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated

throughout Wisconsin; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wis. Stat. § 133.01, *et seq*.

**Count III: Violation of State Consumer Protection Statutes (on Behalf of Plaintiffs and the Damages Class)**

175. Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

176. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

177. **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. § 4-88-101, et seq. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which NPK Fertilizers were sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

178. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed NPK Fertilizers in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq*., set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code § 16720, *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of NPK Fertilizers in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiffs and members of the Damages Class are entitled to full restitution and/or

disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially inflated prices for NPK Fertilizers. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200, *et seq*. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

179. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Florida; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Fla. Stat. § 501.201, *et seq*.

180. **Illinois:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the NPK Fertilizer markets, a substantial part of which occurred within Illinois. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the NPK Fertilizer markets. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois. Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of Damages Class. Defendants' unlawful conduct substantially affected Illinois's trade and commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

181. **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as a purchaser of the Defendants' goods, and which caused Plaintiffs to suffer injury. Defendants

took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and NPK Fertilizer purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

182. **Nebraska:** Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' conduct has had the following effects: (1) price competition for NPK Fertilizer was restrained, suppressed, and eliminated throughout Nebraska; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for NPK Fertilizer. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Nebraska. Accordingly, Plaintiffs and members of the Damages Class seek all forms of available relief under Neb. Rev. Stat. § 59-1601, *et seq.*

183. **Nevada:** Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the Nevada Deceptive Trade Practices Act. Nev. Stat. § 598.0923, *et seq*. Defendants' conduct has had the following effects: (1) price competition for NPK Fertilizer was restrained, suppressed, and eliminated throughout Nevada; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members

of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for NPK Fertilizer. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Nevada. Accordingly, Plaintiffs and members of the Damages Class seek all forms of available relief under Nev. Stat. § 598.0923, *et seq*.

184. **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*. In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing NPK Fertilizers because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of NPK Fertilizers, including their illegal conspiracy to secretly fix the price of NPK Fertilizers at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout New Mexico; (2) NPK Fertilizer prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for NPK Fertilizers. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition, or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

185. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which NPK Fertilizers were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to end user indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic

activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout North Carolina; (2) NPK Fertilizer prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for NPK Fertilizer. During the Class Period, Defendants marketed, sold, or distributed NPK Fertilizer in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed NPK Fertilizer in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

186. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 et seq. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout South Carolina; (2) NPK Fertilizer prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in

their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10 et seq., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

187. **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which NPK Fertilizers were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for NPK Fertilizers. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' NPK Fertilizers prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of NPK Fertilizers, likely misled all end user indirect purchasers acting reasonably under the circumstances to believe that they were purchasing NPK Fertilizers at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute unfair competition, or unfair or

deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

188. **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which NPK Fertilizers were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' NPK Fertilizer prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for NPK Fertilizers was restrained, suppressed, and eliminated throughout Wisconsin; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of NPK Fertilizers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of NPK Fertilizers at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing NPK Fertilizers at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of NPK Fertilizers they purchased. Defendants have engaged in unfair competition, or unfair or deceptive acts or practices in violation of Wisc. Stat. §

100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Count IV: Unjust Enrichment[53]**
**(on Behalf of Plaintiffs and the Damages Class)**

189. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

190. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

191. Defendants have unlawfully benefited from their sales of NPK Fertilizers because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged end user indirect purchasers, which purchased NPK Fertilizers at prices that were more than they would have been but for Defendants' unlawful actions.

192. Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

193. Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

194. Defendants have been enriched by revenue resulting from unlawful overcharges for NPK Fertilizers while Plaintiffs and members of the Damages Class have been impoverished by the overcharges they paid for NPK Fertilizers imposed through Defendants' unlawful conduct.

[53] Unjust enrichment claims are alleged herein under the laws of the following states: Alabama, Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

Defendants' enrichment and the impoverishment of Plaintiffs and members of the Damages Class are connected.

195. There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

196. Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

197. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of NPK Fertilizers.

198. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of NPK Fertilizers are ascertainable by review of sales records.

199. It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of NPK Fertilizers.

200. It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased NPK Fertilizers, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

201. The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for NPK Fertilizers is a direct and proximate result of Defendants' unlawful practices.

202. The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

203. It would be inequitable under unjust enrichment principles under the laws of Alabama, Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, for Defendants to be permitted to retain any of the overcharges for NPK Fertilizers derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

204. Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as NPK Fertilizer prices remain inflated above pre-conspiracy levels.

205. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of NPK Fertilizers.

206. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of NPK Fertilizers by Plaintiffs and the Damages Class.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes respectfully request the following relief:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and appoint Blane Benedict and Bryant Parrish Farms Partnership as representatives of the Nationwide Class and the Damages Class, and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class once certified;

B. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unreasonable restraint of trade or commerce in violation of the Sherman Act under a *Rule of Reason* analysis, (d) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (e) acts of unjust enrichment by Defendants as set forth herein.

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, and from entering into

any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for the damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E. That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F. That the Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI. JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: July 24, 2026.

Respectfully submitted,

*/s/ Rex A. Sharp*
Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
**SHARP LAW, LLP**
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
hhepner@midwest-law.com

Michael J. Flannery
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
Two City Place Drive, Second Floor
St. Louis, MO 63141
Tel: (314) 226-1015
mflannery@cuneolaw.com

Stephen R. Basser*
**BARRACK, RODOS & BACINE**
600 W. Broadway, Suite 900
San Diego, CA 92101
Tel: (619) 230-0800
Fax: (619) 230-1874
sbasser@barrack.com

William J. Ban*
**BARRACK, RODOS & BACINE**
640 8th Avenue, 10th Floor
New York, NY 10036
Tel: (212) 688-0782
Fax: (212) 688-0783
wban@barrack.com

Jeffery A. Barrack*
Danielle M. Weiss*
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 963-0600

Fax: (215) 963-0838
jbarrack@barrack.com
dweiss@barrack.com

Sterling Aldridge*
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
saldridge@barrettlawgroup.com

*Pro Hac Vice Application Forthcoming

*Attorneys for Plaintiffs*